STATE OF IOWA, Appellee, v. E. L. TOWNE, Appellant.

HOMICIDE: Self-Defense—Evidence—Jury Question. Evidence
1 reviewed on the question whether a homicide was in self-defense, and held to present a jury question.
   EVANS, J., dissents.

HOMICIDE: Manslaughter—Defining Murder—Effect. It is not error
2 ror to define murder in instructions covering a charge of manslaughter, the instructions covering the latter offense being unobjectionable.

**HOMICIDE:** Manslaughter—Instructions—Careless Handling of
3 Gun. The court may properly explain to a jury when and under what circumstances the negligent or careless handling of a dangerous weapon may constitute manslaughter, even though the indictment does not specifically charge that there was such negligence.

**HOMICIDE:** Justifiable Homicide—Arrest by Private Person for
4 Misdemeanor—Use of Deadly Weapon. Instructions reviewed, and held correct as to (a) the circumstances under which a private party may make an arrest for a misdemeanor; (b) the acts necessary to constitute a valid arrest; (c) the degree of force permissible in effecting such arrest; (d) the arrester's duty to refrain from using a deadly weapon in a deadly manner in making such arrest; and (e) the result, in law, to the arrester if such a weapon was so used as to result in a homicide.

**HOMICIDE:** Self-Defense—Mental Condition of Deceased—Materiality. Under a plea of self-defense, evidence as to the mental
5 condition of a deceased is material only on the question of the attitude of the deceased at the time of the fatal encounter.

**HOMICIDE:** Dying Declarations—Impending Death—Matters of
6 Opinion. Instructions reviewed, and held correct as to (a) the circumstances under which alleged dying declarations were such in fact, and could be considered at all; (b) the evidence proper to be considered by the jury in determining whether the deceased was under the full belief of impending death; (c) the duty of the jury to disregard all matters of mere opinion, if any, expressed by the deceased; and (d) the duty of the jury to consider only such dying statements of the deceased as pertained to the facts and circumstances attending the fatal shot.

**CRIMINAL LAW:** Trial—Misconduct in Argument—Withdrawal—
7 Effect. Statements of the respective counsel as to the extent of the punishment attending a conviction, resulting in a withdrawal by the county attorney of his statement, and the substitution of the statement that the jury has nothing to do with the punishment, which latter statement was confirmed by the court orally and in the formal charge, work no prejudicial error.

**CRIMINAL LAW:** Trial—Separation of Jury After Submission—
8 Effect. The separation of the jury, after submission in a criminal case, for the purpose of answering the calls of nature, or for other innocent purposes, without speaking to nonmembers

of the jury, results in no prejudicial error, especially when such jurors were usually attended by the bailiff or in his sight.

**WITNESSES: Cross-Examination—Homicide.** Testimony of a witness (a) that he arrived at the scene of a shooting immediately after it happened, (b) that he found the defendant near at hand, and (c) that defendant did not want him (the witness) to go to where the deceased was until more help arrived, does not authorize, under the claim of cross-examination, and under the question as to what further happened, testimony that the defendant said "he did not think it safe to go" (that is, to the place where deceased was).

**CRIMINAL LAW: Opinion Evidence—Insanity—Form of Question.** A question to a nonexpert witness as to the insanity of a person must be confined to and based on the facts *previously detailed by the witness*.

**HOMICIDE: Self-Defense—Evidence—Specific Quarrel with Others.** Under a plea of self-defense to a charge of manslaughter, defendant may not interrogate witnesses as to a specific quarrel had by deceased with other people.

**HOMICIDE: Self-Defense—Character of Deceased as to Quarrelsomeness, etc.** Under a plea of self-defense to a charge of manslaughter, witnesses may not be asked as to the "character" of deceased as to quarrelsomeness and viciousness, or as to his general "character" as to habit of attacking people generally. His general *reputation* in this respect should have been called for.

**HOMICIDE: Self-Defense—Insanity of Deceased—Refusal to Permit Showing—Effect.** Under a plea of self-defense to a charge of manslaughter, defendant suffered no prejudice because denied the privilege of showing by opinion evidence that deceased was insane, when decedent's previous conduct was fully shown to the jury by evidence tending to show his unbalanced condition of mind, with attending delusions, and when there was no question as to who made the first assault at the time of the fatal encounter.

*Appeal from Guthrie District Court.*—J. H. APPLEGATE, Judge.

FRIDAY, NOVEMBER 24, 1916.

REHEARING DENIED THURSDAY, JUNE 21, 1917.

DEFENDANT was indicted, tried and convicted of the crime of manslaughter, and appeals.—*Affirmed.*

*Milligan & Moore,* for appellant.

*George Cosson,* Attorney General, *John Fletcher,* Assistant Attorney General, *C. H. Taylor* and *E. R. Sayles,* for appellee.

DEEMER, J.—I. The facts are not seriously in dispute, and the argument is largely directed to the sufficiency thereof to sustain the verdict.

Defendant was a business man, engaged in handling general merchandise in the town of Jamaica. He lived on the same street on which his store was located, and about five blocks due north thereof, his house being the last one on that side of the street. North of his house was a public highway, and north of this highway was a cornfield. At the intersection of the first street south of his house with the street on which the house is situated, there was a small wooden bridge, and just south of that, a small hill rising some 30 or 40 feet to the sidewalk on the west side of the street. Defendant's brother lived about midway between his (defendant's) house and his store, and on the same side of the street. At about 8:30 o'clock in the evening of March 13, 1915, three of defendant's children, a daughter, Gretchen, 19 years of age, and two boys, one about 15 and the other 12 years of age, left defendant's store and started for their home up the street which we have just described. They were followed by a stranger, who is described as a tall man, wearing a cap with the visor down and pulled over the eyes. This stranger followed the children as far north as defendant's brother's house, where he followed defendant's daughter into the yard. Defendant followed his children from the store almost immediately, and overtook them at the brother's house. He found his daughter

and his sons standing near the house, and the stranger
standing 10 or 12 feet north of them. About the time the
defendant arrived at the house, the stranger remarked to
one of the boys: "Are you just coming home from school?"
As the defendant passed on the sidewalk going north, the
daughter went past the stranger to meet her father, and as
she did so, this stranger leaned forward with his cap pulled
down, took a step or two in advance, and made some re-
mark to the young lady, which none of the bystanders
heard or understood. The girl was frightened, and, with
her youngest brother, ran past her father and on to her
own home. Defendant and his oldest boy walked on to-
gether toward their home, and the stranger followed them
until they reached their own house. As they approached
their house, defendant instructed his son, who was with
him, to run into the house and get his gun—a shotgun.
The boy obeyed, brought the gun out and loaded it, and
handed it to his father, near the south door of the house
at the west end thereof. It should be remarked that the
streets were not lighted in any manner, and that the night
was dark. When defendant received the gun from his son,
the stranger being in the yard of defendant's house and
something like 15 feet away, and approaching him, he (de-
fendant) ordered the stranger not to come any closer, and
asked him what he was doing there. The stranger replied
that "he had just gotten off the train and was walking
around." He (defendant) asked him his name, and he
responded by asking: "Who lives here?" He (defendant)
then asked him what his business was, and, instead of an-
swering, he asked another question and continued to walk
toward the defendant. Defendant then told him not to
come any closer or he would shoot, and at the same time,
it is claimed, told him he would take him up town and turn
him over to the marshal. Acting upon this suggestion, he
ordered the stranger to go ahead of him down town. The

stranger started toward town, with defendant and his eldest son following him, the defendant with gun in hand. The stranger halted at times, but defendant pressed him on. When they got to the bridge south of defendant's house, the stranger stopped, and said to defendant that he did not intend to hurt them. Defendant again told the stranger to move on down town, and the stranger proceeded on across the bridge and on to the top of the little hill which we have described, and there stopped. Defendant, with his son, was then at the bottom of the hill. As he reached the top of the hill, the stranger stopped, screamed in a loud tone, "You fellows," and rushed back with arms extended to where defendant and his son were standing, and came within 8 or 10 feet of defendant, who had then leveled his gun upon the stranger, and, as he approached, defendant says he made a motion as if to grab the gun, when he (defendant) fired both barrels at the stranger, resulting in wounds from which the stranger died the next afternoon. This stranger was soon found to be a man named William Berry, an eccentric, if not insane, person, who had a brother living at Jamaica until a few days prior to the shooting. Berry had lived at Perry until a few months prior to his death, and, after leaving Perry, lived at Waukee, where he was working for his board. He was discharged by the people for whom he had been working, because of his peculiarities and eccentricities, and taken by them to the depot in Waukee on the day he was killed. Before he died, he told defendant that he (defendant) was in no way to blame; that he forgave him; and that, if he had not followed defendant's daughter, he would not have been hurt.

The court submitted the case to the jury to determine whether or not defendant was acting in self-defense, and instructed that the defendant was not justified in using a deadly weapon simply to effectuate an arrest of the stranger for violation of some town ordinance or for a misde-

meanor. Whilst these instructions are complained of, they seem to announce correct rules of law, and, on the whole record, the case was properly submitted to the jury for it to determine whether or not defendant's act was in lawful defense of his person.

1. HOMICIDE: self-defense: evidence: jury question.

We are of opinion that it was a fair question for the jury to determine whether or not defendant was justified, under all the circumstances, in taking the life of Berry. It cannot be said, as a matter of law, that the case is so plain for defendant as that a conviction should not be had under the circumstances disclosed. Defendant was bound to act as a reasonably cautious and prudent person would, under all the circumstances as they appeared to him at the time, and cannot excuse himself on the theory that, under the excitement of the moment, he acted with undue haste, or, because of other transactions of which he had knowledge, supposed something might happen which was out of the ordinary.

There is some doubt in the record as to whether defendant did those things which would constitute a lawful arrest of Berry, and there is also doubt as to whether or not Berry was guilty of anything more than committing a trespass on defendant's property. But, aside from these doubts, it was for the jury to say whether or not defendant's act was in the lawful defense of his person, and whether or not there was not some other reasonable course for defendant to have pursued rather than to take the life of Berry. It is true that defendant did not know the stranger until after he shot him, and did not know that he was an eccentric or partially insane person, and did not know that he was not of ordinary mind and ability; but there was nothing in his conduct, down to the time when he rushed back to where defendant was, after he was started on his journey down town, to indicate to defendant that

he intended anyone any physical harm. When he got to the bridge, he assured defendant that he did not intend to hurt defendant or his son, and he displayed no hostile purpose until he reached the top of the little hill, where, as defendant says, he rushed back upon him and his son. No one claims that he was armed at that time, or that he, by any action, indicated that he intended to do more than grab the gun when he got to where he could do so. We neglected to state that, during all the time defendant followed the deceased, he kept his gun leveled upon him, and there is some doubt about just where Berry was when defendant shot him.

2. HOMICIDE: manslaughter: defining murder: effect.

II. Some of the instructions are criticized. One of them simply defines murder according to the statutes of the state, but the instruction immediately says in terms "The charge in this case is of a crime of a lower degree of turpitude than that of murder, to wit, the crime of manslaughter," and manslaughter is then defined. There was

3. HOMICIDE: manslaughter: instructions: careless handling of gun.

no error in this instruction. Another says that one may, through negligence or carelessness in the handling of a deadly weapon, be guilty of manslaughter. This, too, is a correct statement of the law applicable to this case, although the indictment does not specifically charge negligence or carelessness in the handling of the gun.

4. HOMICIDE: justifiable homicide: arrest by private person for misdemeanor: use of deadly weapon.

The following instructions are challenged:

"If you find from the evidence in this case that said William Berry was at the time in any manner disturbing the peace and quiet of the defendant, or his family, within the town of Jamaica, then he was guilty of a violation of the provisions of said ordinance, and, if said offense was committed or being committed in the presence of the defendant, then

the defendant had the right under the law to arrest or cause the arrest of the said William Berry, and to turn him over to a peace officer of said town of Jamaica. You are instructed, however, that, in making such arrest, if he did make such arrest, or attempt to make such arrest, it was the duty of the defendant to in some manner give said William Berry to understand that he was so placed under arrest, and that said William Berry should submit to such arrest, and that it was the intention of the defendant to turn said William Berry over to a peace officer of the town of Jamaica. In making such arrest, the defendant had no right to use any other means or any greater force than was reasonably necessary to accomplish that purpose, and, in his efforts to make such arrest or to turn said William Berry over to a peace officer of the town of Jamaica, in accomplishing that end alone, he had no right to make use of a deadly weapon in a deadly manner to accomplish such purpose; and so the defendant cannot justify the taking of the life of said William Berry merely on the grounds that he, as a private citizen, had the right to arrest said William Berry, and was in the act of taking said William Berry to a peace officer of the town of Jamaica for the purpose of turning him over to such peace officer, and this feature of the case is submitted to you only for the purpose of your determination of the fact as to whether, under all of the circumstances disclosed by the proof, the defendant was at the time justified in being armed with a deadly weapon, and in using same in a deadly manner: And so, in the determination of this case, you will bear in mind that, so far as the mere making of an arrest by the defendant as a private citizen, of said William Berry, and in attempting to deliver him to a peace officer of the town of Jamaica, Iowa, however said William Berry may have resisted such an arrest, if it went no further than mere resistance to such arrest or attempt to flee from said defendant to avoid an arrest, the

defendant would not be justified in using a deadly weapon in a deadly manner; nor would he be justified in so using such deadly weapon in a deadly manner unless in doing so he was acting in necessary self-defense, as his right in relation thereto is more fully explained to you in subsequent instructions."

These announce correct, well-established rules of law, and no authorities need be cited in their support. The following instructions are also criticized:

5. HOMICIDE: self-defense: mental condition of deceased: materiality.

"Certain testimony has been offered and submitted to you upon the trial of this case tending to show the condition of William Berry, deceased, covering a time about December 30, 1914, up to and including March 13, 1915, the day on which the wounds of which he died were inflicted upon him. This evidence is proper for you to consider in connection with all of the other facts and circumstances, in so far as it may throw light upon the attitude of the deceased at the time he received the fatal shot; but it would not be proper for you to consider said evidence so offered and submitted to you upon this trial for any other purpose whatever.

6. HOMICIDE: dying declarations: impending death: matters of opinion.

"Certain evidence has also been offered and submitted to you upon the trial of this case with reference to statements or declarations claimed to have been made by said William Berry on the day following the evening he received the fatal shot. This testimony is proper for your consideration in the determination of this case only in the event that it is shown by the evidence offered upon the trial of the case that, at the time said alleged statements or declarations were made by said William Berry, if you find they were made by him, that said William Berry made same under the belief that the wounds which had been inflicted upon him were fatal, and that he could not recover

from the effects thereof. You are further instructed that. unless you find from the evidence in this case that, at the time said William Berry made any statements or declarations with reference to the matter of his being shot, made same under the belief that he would not get well, but that he would die from the effects of such wounds, it will not be proper for you in the determination of this case to consider or give weight to any of the statements or declarations claimed to have been made by said William Berry as testified to by the witnesses upon the trial of this case.

"If, however, you find from the evidence in this case that, at the time said William Berry made any statements or declarations with reference to the transactions in controversy in this case, he had been advised that he could not get well, and that at said time he entertained no hope of recovering from the effects of said wounds, then it will be proper for you to determine from the evidence offered upon the trial of this case what he in fact said with reference to said transactions, and, having thus determined what he in fact said with reference thereto, you may consider it in connection with all of the other facts and circumstances disclosed by the proof, and give same such credit and weight as you believe, under all of the circumstances, it is fairly and reasonably entitled to.

"In determining whether said William Berry, at the time he made the statement or declarations testified to by the witnesses upon the trial of this case, believed that he would not get well, but that he would die from the effects of the wounds inflicted upon him, it will be proper for you to take into consideration the fact, if it be a fact, that the attending physician informed him that he could not recover from the effects of said wounds, the nature and character of the wounds themselves that were inflicted upon him, together with all of the other facts and circumstances shown by the evidence that may throw light upon the question of

whether or not said William Berry, at the time he made the statements or declarations as claimed by the witnesses who have testified upon this trial, thought or believed that he would not get well.

"It will not be proper, however, for you to give any weight to any mere opinion that may have been expressed by William Berry; but you should consider only such statements as he is shown by the evidence to have made as to the circumstances under which he was shot, and as to what occurred at said time."

There was no error here. We need not notice the other instructions, as they were the usual ones given in such cases.

III. In the closing argument, counsel for the State told the jury, in answer to some suggestions made by defendant's counsel to the effect that, if defendant were convicted, he would have to go to the penitentiary, that, under the law, the punishment might be a fine. This statement was challenged by counsel for the defendant, and counsel for the State then withdrew the statement, and told the jury that they had nothing whatever to do with the punishment; that this was a matter within the discretion of the court. The court also told the jury that it had nothing to do with the punishment. It also so instructed in its formal charge. There was no error here.

7. CRIMINAL LAW: trial: misconduct in argument: withdrawal: effect.

IV. The jurors were permitted to separate, after they had retired to deliberate upon their verdict, sometimes to answer a call of nature, and sometimes on other errands, as to get a cigar; but, generally speaking, they were either accompanied by an officer of the court or were within sight of such officer, and they did not speak to anyone while so separated. There seems to have been no toilet room in the courthouse, and some of the jurors were permitted to go to one near the courthouse, which was used by the occupants

8. CRIMINAL LAW: trial: separation of jury after submission: effect.

thereof to relieve themselves. They were gone but a few minutes, and had no conversation with anyone, save fellow jurors. There is no such showing of misconduct as will justify a reversal on this ground.

V. Certain rulings on testimony are complained of. A witness, who arrived on the scene immediately after the shooting, found defendant near at hand, and testified that defendant did not want him to go to where Berry was until more help arrived, and, in answer to a question as to what further happened, he said defendant told him he did not think it safe to go. The question was objected to, and the answer moved to be stricken for several reasons; among others, that it was not cross-examination. This latter objection was good, and the ruling sustaining it, correct. A nonexpert witness was asked to state whether Berry was sane or insane before the day of the killing, without confining the questions to the acts and circumstances detailed by the witness in his previous examination. The ruling was correct under all the authorities. A nonexpert's opinion on the subject must be confined to the facts detailed and considered by him.

9. WITNESSES: cross-examination: homicide.

Witnesses were asked as to a specific quarrel had by Berry with other people, but were not permitted to answer. The rulings were correct.

11. HOMICIDE: self-defense: evidence: specific quarrel with others.

Others were asked as to his character as to quarrelsomeness and viciousness, or his general character as to habit of attacking people generally. Had these inquiries been directed to his general reputation as to quarrelsomeness, they might well have been answered. But, as will be observed, they went to his character in the first instance, and to his habit of attacking people in another. Consequently, there was no error here. Moreover,

12. HOMICIDE: self-defense: character of deceased as to quarrelsomeness, etc.

enough went to the jury without objection or exception to
prove all that defendant was entitled to in this connection.

13. HOMICIDE:
    self-defense:
    insanity of
    deceased: re-
    fusal to per-
    mit showing:
    effect.

A doctor who examined Berry while
he lived at Perry, and who told of what he
saw of him there, was not permitted to an-
swer whether he had an opinion as to his
sanity. We here quote the following from
the record:

"My call in the morning was after the trouble that
had arisen between Berry and Shearer. He appeared to
have lucid intervals in the morning. At times he was lucid
and at times he was not. Q. Were you able to determine
—did you know whether or not the man was sane or in-
sane? Mr. Taylor: Objected to as incompetent, immaterial
and too remote. The Court: Yes, I do not think that is
material to any matter in this, except simply as to his ac-
tions and conduct at that time, and this will show to the
jury the nature and characteristics of the man. The mere
fact that he was insane would not justify this act, so I
do not think that would be proper. Exceptions saved."

This presents the most doubtful question in the case.
The doctor was permitted to describe Berry's conduct after
a difficulty he had just had with a man by the name of
Shearer, and the latter was permitted to tell of this diffi-
culty. Other witnesses were permitted to show Berry's
conduct at various times before the homicide. This tended
to show that he was of unbalanced mind, and at times had
delusions. Defendant had no knowledge of these things,
and there is really no dispute as to his conduct on the even-
ing of the day he was shot. In view of the fact that his
previous conduct was fully explained, we do not think the
defendant suffered any prejudice in not being permitted to
show by opinion evidence that the man was insane. If de-
fendant knew that fact, the case was worse for him than
if he did not know it. If he did not know, he had the right

to judge him a sane man and to govern himself accordingly. Whether sane or insane, if he acted in such a manner as to justify the defendant in taking his life, he (defendant) had the benefit thereof in the instructions. There was really no question in the case as to who made the first assault, and Berry's conduct is not a matter of dispute. The question was: What was defendant's conduct in view of Berry's actions as reasonably understood by defendant?

We reach the conclusion that no prejudicial error was committed by the trial court, and the judgment must be, and it is,—*Affirmed*.

GAYNOR, C. J., WEAVER and PRESTON, JJ., concur.

EVANS, J., dissenting. The evidence in this record is overwhelming that the defendant acted under actual apprehension of danger. Upon this record, I think there was no warrant for a finding by the jury that the defendant did not act in reasonable self-defense. The killing was regrettable, of course, but the circumstances leading up to it were quite beyond the control of the defendant, and their real nature, as later discovered, was not then known to him. There was no malice or ulterior purpose of any kind in the conduct of the defendant, and none is claimed; nor do I think that there is any warrant for holding that his conduct was reckless under the circumstances confronting him. Undue timidity is the utmost that can be claimed against him. To hold this defendant as a felon upon the evidence presented in this record is to my mind almost as appalling as the killing with which he is charged.